HICKOK v. COWPERTHWAIT et al.

(Supreme Court, Appellate Division, Second Department. November 17, 1911.)

1. FRAUDULENT CONVEYANCES (§ 298*)—INTENT—EVIDENCE.

Where an insolvent transferred certain stock to his son without any valuable consideration and thereafter continued to use and control the property as before, and, when proceeded against in various proceedings, gave three different and wholly inconsistent explanations of the transfer, it was properly declared fraudulent and invalid.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Dec. Dig. § 298.*]

2. FRAUDULENT CONVEYANCES (§ 301*)—ANTECEDENT DEBT—CONSIDERATION.

Mere existence of an antecedent debt is not sufficient to establish an innocent purpose on the part of the grantee of an insolvent, when proof of fraudulent intent on the part of the grantor is shown.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Dec. Dig. § 301.*]

Thomas and Carr, JJ., dissenting.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Special Term, Kings County.

See, also, 137 App. Div. 898, 122 N. Y. Supp. 1131, and 131 N. Y. Supp. 838.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and RICH, JJ.

Hector W. Thomas (Lewis Squires, on the brief), for appellant Frederick S. Cowperthwait, trustee.

W. H. Van Benschoten (John J. Halpin, on the brief), for appellant Aymar.

Samuel Evans Maires, for respondent.

BURR, J. [1] The fraudulent character of the transactions condemned by the judgment under review was considered by this court, so far as Frank H. Cowperthwait, the judgment debtor, is concerned, on the appeal from a judgment dismissing the complaint. Hickok v. Cowperthwait, 134 App. Div. 617, 119 N. Y. Supp. 390. The opinion then delivered, concurred in by the entire court, discussed the evidence presented in that record. So far as the judgment is concerned, the evidence is not substantially different, except that the fraud of Frank H. Cowperthwait is more clearly demonstrated by the fact that upon this trial an attempt was made to give a third explanation of the purposes of the transfer. As was pointed out in the opinion when the case was here before, when examined in supplementary proceedings he gave one explanation of the transfer; upon the trial, he abandoned that as palpably false and untenable, and attempted a second, inconsistent with it, but equally unsatisfactory; upon this trial, a third attempted explanation is made. As pointed out by Mr. Justice Clark in his opinion, such attempts by new evidence and new theories to meet the difficulties of the case, as indicated in the opinion previously given, are entitled to little credence and merit severe condemnation. The fraudulent purpose of Frank H. Cowperthwait being clearly established by evidence entirely competent as against him, the burden of proof then devolved upon the other defendants to show an innocent purpose upon their part. This burden has not been met.

[2] As pointed out in the previous opinion, the mere existence of an antecedent debt is not sufficient to establish an innocent purpose on the part of the grantee, when fraudulent intent upon the part of the grantor is shown. On the contrary, the very fact that such a debt existed may furnish a pretext to the grantees to unite with the grantor in a fraudulent purpose to put his property in a position, not where the antecedent creditors may be secured, but where the judgment debtor may continue to use the property for his own purpose, as manifestly he did in this case. The position of the defendants Aymar in this case is not helped by the evidence upon this trial, and for the reasons stated by Mr. Justice Jenks in his opinion on the Aymar appeal (137 App. Div. 94, 122 N. Y. Supp. 78) it is impossible to close

one's eyes to the fact that these persons were entirely ready to unite with Frank Cowperthwait, the judgment debtor, in putting his property in such a shape that he could continue to use it, possibly to some extent for their benefit, but primarily for his own, freed from any claims of his judgment creditors.

I recommend that the judgment appealed from be affirmed; but, in view of the full discussion in the two opinions above referred to, it seems to me that further discussion is unnecessary. Judgment affirmed, with costs. All concur, except THOMAS and CARR, JJ.

THOMAS, J. (dissenting). Mary E. Cowperthwait, dying in 1888, by her will made her husband, Frank H. Cowperthwait, and her son, Frederick S. Cowperthwait, trustees to pay the income of her property to the former for his life, with remainders to her children and grandchildren. The questions here involved are: (1) Whether transfers of stock by Frank to Frederick, as trustee, for moneys diverted from the wife's estate by Frank, and for moneys advanced by certain of the children, are fraudulent as against judgment creditors of Frank and Frederick; (2) whether Aymar became a pledgee of certain of such stock in fraud of such creditors. Frank received and used personally $16,400 of money belonging to his wife's estate, as follows: $2,900 from property sold October, 1904; $7,500 at a date earlier than that; and $6,000 June 29, 1904, the date of the transfer of the stocks. A judgment for $11,949.84 in favor of one Gerard, recovered against Frank in 1894, was on January 21, 1897, purchased by the wife's five children, each contributing $2,400 therefor, and the judgment was assigned to Frederick, trustee. For this Frank gave each child his note for $2,400, still unpaid except the interest in part. This transaction is conceded. On or about June 29, 1904, Frank suggested to his father that the sisters and brothers should be protected respecting their mother's estate and the Gerard judgment, and on that day the father executed to Frederick 11 assignments of certificates of stock, aggregating 99 shares of the Brooklyn Chair Company and 308 shares of the common stock and 63 shares of the preferred stock of the Brooklyn Factory & Power Company. These assignments were inclosed with a letter from father to son:

"Dear Fred Enclosed are the assignments of my interest in various stocks held by different parties, that I agreed to give you when you were here on the 29th ult. to execute the deed of the Waverly Ave. property. They are made out to you as trustee of the Gerard judgment that you took up in 1897, and I hope that in time you will realize enough from them to make you whole, incldg. interest to date of final settlement. Any excess obtained to be paid towards liquidating the other debts of mine after Nancy and Daisy are taken care of.

　　"Yours, etc.,　　　　　　　　　　　　　　　　　　Father."

The action is to set aside certain of these transfers. The original assignments and the subjects thereof were thereafter somewhat modified. All the stock as originally assigned had been issued to Frank and by him pledged to creditors, and stood on the books in the name of the pledgees, and after the assignments Frank (1) procured the release of certain stock and transferred it unincumbered to Frederick,

trustee; (2) regained possession of certain of the pledged stock for the purpose of having it entered on the books in the name of Frederick, trustee, and then returned to the creditors; (3) transferred to Frederick, trustee, additional stock and made substitutions in certain instances for stock pledged originally. Aymar is one of such creditors. Before considering his conduct, the dealings of father and son respecting the transfer may be examined. The status on June 29, 1904, was that Frederick held, subject to rights of pledgees, of Chair stock 99 shares, of Power stock 308 shares common, of Power stock preferred 63 shares. The father, in addition to the above, had as his remaining property 52 Power unpledged shares which, on October 25, 1904, he transferred to his son as trustee. Aymar held as security the following: Power stock, 30 shares; Chair, 49 shares; and to this Frank added on May 25, 1905, 25 shares of 50 Power shares presented at that date to him by the Power Company, of which he was president.

On November 5, 1906, Aymar delivered to Frank the 30 and 25 shares of the Power Company for the purpose of issuing them directly to Frederick, trustee, and to these 55 shares the father procured to be added 5 shares standing in Frederick's (as trustee) name, and caused on November 5, 1906, two new certificates to be issued to his son, Frederick Cowperthwait, trustee, and Frederick as trustee indorsed the same to Aymar as collateral to his debt. About December 14, 1906, Aymar returned to Frank the 49 shares of Chair stock, the latter purchased one additional share, and caused the 50 shares, in certificates of 25 shares each, to be reissued to Frederick, trustee, on December 28, 1906, and the latter indorsed them to Aymar as security for his debt. Frank took the 52 shares of Power stock transferred to Frederick, trustee, October 25, 1904, indorsed by the latter, and pledged it as collateral for a note of $5,000. February 16, 1907, Frank paid the note, caused the 52 shares to be reissued in two certificates of 25 and 27 shares to Frederick, trustee, who at the father's instance indorsed the certificate for 25 shares, and the former transferred it to one Boardman as security for money with which to pay the note. On June 17, 1907, Frederick, trustee, transferred the 27 shares to Frank, who transferred them again to Frederick October 19, 1907. One Bugbee held as security 36 Power shares, one-half common and one-half preferred. October 1, 1906, Frank obtained the 16 shares preferred and caused it to be reissued as follows: October 4, 1906, 12 shares to one Meech, to whom James sold it; 6 shares October 4, 1906, to "Frank H. Cowperthwait, trustee," to which he added a share bought by himself, and caused on October 19, 1901, a new certificate for seven shares to be issued to Frederick as trustee. Prior to June 29, 1904, the father had placed 85 shares of Power stock in his son's name, to be pledged to secure the son's note indorsed by the father. It was discounted by the People's Trust Company, and Frank took the money. On November 5, 1906, the Trust Company exchanged this certificate for two, one for 35 shares and one for 50 shares, issued to Frederick, trustee, and indorsed by him to the company.

On June 22, 1907, Frank procured a certificate of 29 shares of

Power stock to be issued to Frederick as trustee; the latter indorsed in blank to the Trust Company in exchange for the certificate for 35 shares held by it. The father then, on June 22, 1907, obtained a new certificate for 6 shares in the name of one Crane to whom he had sold it. On June 29, 1904, when the assignments were made, certain Chair stock stood as follows: 25 shares owned by Frank, pledged to the Brooklyn Chair Company for $600 borrowed; 13 shares owned by Frank, pledged to Yale Bank for $500 borrowed; 12 shares owned by Frank, pledged to Aymar for $500 borrowed. After the Bicknell & Sembler judgments were recovered against Frank and Frederick in January, 1907, Frank paid all these loans and received the three certificates aggregating 50 shares February 4, 1907, had two certificates of 25 shares each to Frederick as trustee. The latter indorsed them in blank, and February 15, 1907, Frank sold one to Boardman for $4,000 cash and in discharge of a debt for $1,200, but pledged 25 shares Power stock to Boardman to indemnify him against loss from the transaction. This 25 shares of Power stock was delivered as follows: Boardman's check for $4,000 to the order of Frederick, trustee, was delivered to Frank, Frederick indorsed it, Frank paid $4,000 on the $5,000 note at the State Bank and so released 52 shares of the Power stock, which was reissued in 25 and 27 share certificates to Frederick, trustee, and 25 shares pledged to Boardman as security against loss on the purchase of the 25 shares of Chair stock On July 26, 1907, Frank holding two notes, each for $1,000, made by the United States Rattan Company, discounted them with the Herman Capelle Company and pledged as collateral the 25 shares of Chair stock, issued on February 4, 1907, in the name of Frederick, trustee, and indorsed in blank by Frederick, trustee, for such purchaser.

After this general review of transactions subsequent to the transfer of June 29, 1904, it is necessary to examine critically the final status of Frederick, trustee, what was in fact done by James, and whether the plaintiff's rights became superior to those of the beneficiaries and Aymar by reason of a fraud tainting their holdings. Any intelligent conception and judgment of the transaction must keep in constant foreground that all of the stock in the assignments of June 29, 1904, was held by creditors, and that mere equities were carried to Frederick, trustee, which could be saved from extinction and made valuable only by most prudent and skillful financiering, and if the father, best equipped for that duty by experience and relation to the industries involved, and the trustee honestly co-operated for that end, their action would not amount to a fraud that would undo the original assignments. October 25, 1904, the father transferred 52 shares Power common to Frederick, trustee, and received it back indorsed by the latter and raised $5,000 on it at the State Bank. The father had a right to give to Frederick, trustee, only the equity in the manner adopted. Follow these shares. February 16, 1907, Frank paid the note and had the 52 shares reissued to Frederick, trustee. June 17, 1907, for a purpose not appearing, Frank took the 27 shares and held until October 19, 1907, and returned them to Frederick, where they remain. The 25 shares Power were transferred to one Boardman on February 16,

1907, to indemnify him against loss in the purchase at the time of 25 shares of trusteed Chair stock made at the time and for an existing debt of $1,200, and the $4,000 was used to pay the State Bank as above stated. Mindful that the father intended to transfer only an equity in the 52 shares, I discover no fraud in this transaction whereby the trustee finally retained free 27 shares of Power stock, and 25 more pledged as collateral as stated.

Take the next act indicating fraud as alleged in the order alleged by plaintiff's counsel. In this, Frank, having procured from Bugbee, pledgee, 18 shares Power Pr., which was subject to the assignment of June 29, 1904, sold 12 shares to Meech, put the remaining 6 shares in his own name as trustee on October 4th, and on October 19th transferred them, with an additional share, to Frederick, trustee. The result of this manipulation is that the trustee lost his equity in 18 shares pledged to Bugbee and got 7 shares free, so far accomplishing the necessary purpose of clearing the incumbrances on the assigned stock. What the 12 shares to Meech brought I do not discover, but it is noticeable that the father paid the State Bank $1,000 more than he received from Boardman. June 29, 1904; Frank had assigned his equity in 30 shares Power and 49 shares of Chair held by Aymar as collateral, and to Aymar's holding Frank had added 25 shares Power issued to him in May, 1905. Aymar permitted Frank to reissue to Frederick, trustee, this stock, adding 5 shares received from Frederick, trustee, whereupon it was returned to Aymar, who has it. Analyze this act. In all the stock returned by or to Aymar, save the 5 shares of Power, the trustee had an interest subject to the rights of Aymar, and the only change was one of form; the trustee taking the certificates directly and then transferring to Aymar. But it is said that the trustee subjected 5 shares to Aymar's debt. So he did, but he received the equity in 25 shares of Power that he had not had, and one additional share of Chair stock. I find here no evidence that the father, or trustee, or Aymar, were robbing the trust, or that Aymar did an improper thing.

In the matter of the People's Trust Company the father procured the exchange of the 85 shares Power, pledged before June 29, 1904, for the father and son's obligation for the father's debt, for two certificates, issued to the trustee and by him indorsed, and later Frank procured the surrender of 35 shares by depositing 29, and sold the 6 remaining shares to Crane, to whom they were issued. Undoubtedly this transaction was to get 6 shares released to sell to Crane for cash. I do not find from the evidence as to whether Frank made any payment to the trust company to procure the release. Whether the trustee received an equivalent at that or any time for his equity in these six shares will be considered. But at this juncture it may be claimed that the father was indebted therefor to the trustee, although it should be observed that somebody, presumably the father, was paying the interest necessary to carry the loans for which all the stock was pledged. It has been noticed that the father in February, 1907, had two certificates of Chair stock, 25 shares each, issued to the trustee, which Frank had caused to be reissued in place of shares pledged severally to

the Brooklyn Chair Company, the Yale Bank, and Aymar, for amounts aggregating $1,600. There seems in this to be no fraud upon the trust so far, except that the father has paid a debt, and aided the trust by the amount paid. Twenty-five shares of this stock the father sold to Boardman for $4,000, and to discharge a debt for $1,200, and applied the money on the $5,000 indebtedness to the State Bank, a transaction already noticed, and one entirely proper in every phase of it. In the following July, 1907, Frank pledged the other 25 shares, re-issued to the trustee as above, to the Herman Capelle Company as collateral to two notes for $1,000 each, held by Frank, and received $1,880. This transaction analyzed is this: Pledged to creditors 50 shares of stock for $1,600; redeemed by father personally, and 25 shares pledged for $1,880 to the Capelle Company and 25 shares pledged as collateral to Boardman to raise $4,000 used to release the 52 shares of stock held by the State Bank, with the result that the trustee held 27 of those shares free, and the other 25 shares subject to any loss that might come to Boardman. The result of the several changes is that, while the trustee released finally and Frank used some 12 pledged shares Power Pr. sold to Meech and 6 shares common sold to Crane, it was replaced by 52 shares Power common, 27 being left free, 30 shares Power common, and 1 share Chair.

From deficiency in the evidence I cannot ascertain how much Frank's cash payments exceeded his receipts, but excluding unshown payments of interest, which must have been considerable, the sum does not seem to exceed $1,220 as shown by defendant's statement. If the correct view be that the father, owing honest debts to his children, could only keep the collateral in trust therefor unaffected by fraud by leaving the assigned shares untouched by him, and leaving Frederick to struggle with the load and escape the burden of it as best he could, then the assignments were fraudulent. But, as will appear later, the debt was honest; its payment was sacredly obligatory. The father's property interests were fragmentary and in precarious condition. The son was 24 years of age, and it required the resources of the father to readjust the loans, paying one here and contracting another there, borrowing anew and selling stock where a little could be set free. Had it not been done, all would have been sacrificed. I do not regard the father's vigilance and interposition as an evidence of fraud, but as exhibiting a sense of just obligation. It is true that the assignments were made in June after actions begun in May against Frank and Frederick to recover judgments for causes of action based on negligence arising in February, 1904, whereon judgments were recovered in January, 1907, upon which were executions returned unsatisfied, and following which were proceedings supplementary to execution, and the receiver was appointed in December, 1907. These facts must be considered in arriving at a judgment concerning the nature of the acts of the defendants: The Gerard judgment against Frank was recovered in 1894. It was assigned to Frederick, trustee. The five children paid each $2,400. The judgment was a debt on June 29, 1904. Frank had some $16,400 of the mother's estate.

Why should Frank not undertake to secure these debts? And he

did. The matter was urged by the son, and the father made the assignments. They were assigned for the purpose stated in the letter of July 6, 1904, inclosing them, viz., to enable the trustee to realize the amount of the Gerard judgment and to apply the excess, if any, to liquidating the father's other debts "after Nancy and Daisy are taken care of." The other debts referred to relate to money owing the estate. The father made these assignments to effect payment of an existing indebtedness to his children, and he was quite justified legally (Lehrenkrauss v. Bonnell, 199 N. Y. 240, 92 N. E. 637) and morally. It may be that he feared these judgment creditors would seize his property, and that he preferred to pay other creditors, even his children. Preference of creditors is not fraud. Maass v. Falk, 146 N. Y. 34, 40, 40 N. E. 504. Although Frederick, the trustee named in the assignment of the Gerard judgment, had not asked the security, Frank could make legal provision for it, and much the more so without the request or consent of the beneficiaries. National Bank v. Bonnell, 46 App. Div. 302, 61 N. Y. Supp. 521. (See opinion Hirschberg, J., 26 Misc. Rep. 541, 57 N. Y. Supp. 486); Clements v. Beale, 53 App. Div. 419, 65 N. Y. Supp. 1093. It may be that the assignment will result in the payment of the children-creditors and leave his later creditors unprovided for; but that does not taint with fraud the transfers. Dodge v. McKechnie, 156 N. Y. 514, 51 N. E. 268. Even if the father made the transfers with a fraudulent motive, the son did not participate in his guilty intention, and, if the father did what he did to secure his children their debt and to make compensation in whole or in part for what he had taken from the mother's estate, his act well and honestly done is beyond other assailing creditors, although he afterwards made substitutions in the subject of the trust. Cohnfeld v. Tanenbaum, 176 N. Y. 126, 68 N. E. 141, 98 Am.St. Rep. 653.

The father's statements on his examination in supplementary proceedings, contrasting with his testimony in this action, may make against the probity of his motive, but that does not affect the son's integrity in receiving the transfers. Frank did state, it appears, that he used the dividends to some degree for his personal expenses; on the trial he stated that all were used for payments of interest or principal upon loans; but beyond this testimony as first given by Frank, not available against Frederick and the other defendants, I find no evidence that any moneys received from stocks were used for Frank's own purposes. It may be that Frank was beguiling his own children, as well as seeking to defraud other creditors, and that his claims and declarations present too many varieties to exculpate him, yet when I look at what he wrote and did on June 29 and July 5, 1904, I find that he made a valid trust, which neither he nor Frederick could undo and which could not be wrecked by any changes or manipulations that either permitted. The beneficiaries acquired interests which were beyond disturbance by misconduct on the part of the trustee or his father. It would be a dangerous doctrine that a trust may be found fraudulent because the trustee abused his office.

It is urged that upon former appeals all questions here involved have

been decided favorably to respondents. The appeals were from judgments dismissing the complaint. 134 App. Div. 617, 119 N. Y. Supp. 390; 137 App. Div. 94, 122 N. Y. Supp. 78. The testimony relating to the transfer was the evidence of the father in supplementary proceedings and on the trial. The court was undoubtedly influenced in its decision by the infirmities of the father's evidence whereon the dismissal was dependent; but the present record shows by documentary evidence, aided by the evidence of the son, what the transaction was, and, while it may not reconcile the father's testimony, it does establish a legal status on the part of the beneficiaries that is not affected by the father's intention or action. The opinion of the court (137 App. Div. 94, 122 N. Y. Supp. 78) relates to the appeal by Aymar. The evidence did not show that Aymar's stock was returned for a special and temporary purpose consistent with the continuance of the lien. But the present record shows that the stock was returned for the purpose of reissuing it to Frederick, trustee, and then returning to Aymar. The purpose and acts are clear and credible, inasmuch as the testimony of Frank is substantiated, as to the 49 shares, by the correspondence. The matter is simple. Aymar held the certificates directly from Frank. Frederick, trustee, held assignment (save 25 shares of Power stock) of the pledgor's interest. The same result in a preferable form was secured by reissuing the stock; the trustee actually bettering himself by securing the equity in the 25 shares of Power stock. Aymar received again precisely what was his own; the trustee lost nothing save 5 shares subjected to Aymar's lien, and made the gain stated. There is not the slightest evidence that Aymar had any knowledge of any fraud contemplated or effected. His action was, so far as I can discover, beyond criticism.

In this connection it will be noted that much of the evidence upon which reliance is placed to find fraud on the part of the father and son is not admitted as against Aymar and the Herman Capelle Company, another pledgee of stock accused of a fraudulent holding. This is so as to Frank's evidence in supplementary proceedings received against him alone; so, as to Frank's agreement with Boardman; so, especially as to Aymar, the transaction with Boardman that followed, and the transaction with the United States Rattan Company; so, as to much of the above history of the 52 shares pledged to the State Bank; so, as to Capelle, the delivery of the 25 shares to Aymar and the exchange of certificates by Aymar; so, as to Aymar and Capelle, the exchange of the 85 shares with the People's Trust Company; so, as to Aymar and Capelle the transaction with the Bugbee stock. It would appear that it was the executed purpose of the trial court to exclude as to Aymar and Capelle all evidence of subsequent dealings with the stock by Frank save as they were severally privy to it. With such matter absent from the record, the case against Aymar has no support, and in my judgment the finding of fraudulent participation by the trustee is not sustained. The letter from Frank to the son, dated July 6, 1904, states that the assignments are specifically to realize money to pay the Gerard judgment, and to apply any excess to his indebtedness to the estate, giving a preference over the last purpose to

Nancy and Daisy, Frederick's sisters. The suggested provision for Nancy and Daisy seems to have been to meet individual indebtedness of Frederick. But Frank's property could not be appointed to that purpose. So the trust is effectual only to reimburse those advancing the money for the Gerard judgment, and for the several sums earlier stated, to wit, $2,900, $6,000 and $7,500, so far as they shall appear to have been used at the time of the assignment by Frank H. Cowperthwait for his individual purposes.

The judgment should be reversed, and a new trial granted; costs to abide the final award of costs.

CARR, J., concurs.

***

HICKOK v. COWPERTHWAIT et al.

(Supreme Court, Appellate Division, Second Department. November 17, 1911.)

Appeal from Special Term, Kings County.

Action by Frank H. Hickok, as receiver of Frank H. Cowperthwait, insolvent, against Frank H. Cowperthwait, Frederick S. Cowperthwait, trustee, and Herman Capelle Company and another. From a judgment in favor of plaintiff, defendants Cowperthwait, Cowperthwait, trustee, and Capelle Company appeal. Affirmed.

See, also, 131 N. Y. Supp. 829.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and RICH, JJ.

Hector W. Thomas (Lewis Squires, on the brief), for appellants Frederick S. Cowperthwait, trustee, and Herman Capelle Company.

Samuel Evans Maires, for respondent.

JENKS, P. J., and BURR and RICH, JJ., concur.

